T.C. Memo. 2018-28

UNITED STATES TAX COURT

DAVID KEEFE AND CANDACE KEEFE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15189-14, 29804-15.           Filed March 15, 2018.

<u>Richard Michael Gabor</u>, for petitioners.

<u>Eliezer Klein</u> and <u>Peter N. Scharff</u>, for respondent.

**[\*2]**       MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Chief Judge</u>:  Respondent determined the following deficiencies in Federal income tax, accuracy-related penalties under section 6662(a),[1] and additions to tax under section 6651(a)(1) with respect to petitioners' joint Federal income tax returns:

| Year | Deficiency | Penalty sec. 6662(a) | Addition to tax sec. 6651(a)(1) |
|------|-----------|----------------------|---------------------------------|
| 2004 | $78,292 | $15,658 | -- |
| 2005 | 144,053 | 28,811 | -- |
| 2006 | 218,228 | 43,646 | $408 |
| 2007 | 143,729 | 28,161 | 675 |
| 2008 | 141,870 | 12,817 | 35,468 |
| 2009 | 252,777 | 50,555 | -- |
| 2010 | 309,060 | 61,812 | -- |

After concessions, the issues for decision are:  (1) whether petitioners held Wrentham House Mansion as real property used in a trade or business or as a capital asset; (2) whether certain interest payments petitioners made are properly

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts are rounded to the nearest dollar.

**[\*3]** included in their adjusted basis in the property at the time of sale; (3) whether petitioners are liable for additions to tax under section 6651(a)(1) for their failure to timely file their joint Federal income tax returns for tax years 2006, 2007, and 2008; and (4) whether petitioners are liable for accuracy-related penalties under section 6662(a) for tax years 2004 through 2010.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and facts drawn from stipulated exhibits are incorporated herein by this reference. Petitioners resided in New York when they petitioned this Court.

I.     Petitioners

Petitioners are married and have seven children. Petitioner Candace Keefe has a bachelor's degree in art history and graduate degrees in education and journalism. Petitioner David Keefe is a fertility doctor who was employed full time during all years at issue in this case.

In 1996 Dr. Keefe was appointed Director of the Division of Reproductive Endocrinology at Brown University and Women and Infants Hospital in Providence, Rhode Island. Dr. Keefe and his family moved to Newport, Rhode Island, that same year. Neither petitioner is or was ever a licensed architect or contractor.

**[*4]**  In May 2000 petitioners rented Bois Doré, a 20,000-square-foot residence in Newport, Rhode Island, and on August 23, 2004, they purchased it.  Bois Doré is near downtown Newport, the beach, and the library but does not have a view of the Atlantic Ocean.  Petitioners and their children resided at Bois Doré from May 2000 until they moved to Tampa, Florida, in September 2005.  Petitioners lived in Tampa, Florida, from September 2005 until they moved to New York, New York, in October 2009, where they resided as of the date of the trial.

II.  Real Estate Purchase

On January 21, 2000, petitioners purchased a historic waterfront mansion and grounds on Ocean Avenue in Newport, Rhode Island (Ocean Avenue property), for $1.35 million, intending to restore it.  The Ocean Avenue property was designed by Richard Morris Hunt, the founder of the American Institute of Architects, and the grounds were designed by Frederick Law Olmstead, a well-known landscape designer.  The Ocean Avenue property is at the highest point on Ocean Avenue, and each room provides a view of the Atlantic Ocean.

The Ocean Avenue property was built in 1890 as a summer residence and was used as such until the mid-1960s when it was purchased by a neighboring property owner who abandoned it.  After four decades of sitting vacant and

[*5] exposed to weather and vandals, the Ocean Avenue property was uninhabitable when petitioners purchased it.

On October 30, 2002, petitioners executed a Declaration of Condominium (declaration), dividing the Ocean Avenue property into two units, Unit 1 (Wrentham House Mansion), and Unit 2 (Carriage House) (collectively, Wrentham House Condominium). Wrentham House Mansion constitutes 57% of the Wrentham House Condominium, and the Carriage House constitutes the remaining 43%. On November 1, 2002, petitioners executed a warranty deed in which they conveyed Carriage House to Frank and Ashley O'Keefe. Petitioners retained ownership of Wrentham House Mansion after the sale of Carriage House. The O'Keefes paid petitioners $950,000 for Carriage House.

III.    Financing and Tax Credits

Petitioners financed the purchase of the Ocean Avenue Property and the restoration of Wrentham House Mansion through a series of loans. As restoration costs increased, petitioners were forced to secure additional loans to continue the renovations. Petitioners borrowed over $9 million at interest rates varying from 3.5% to 25% to renovate Wrentham House Mansion.

Petitioners were aware of State tax credits and the Federal Historic Preservation Investment Tax Credit (tax credits) that could have helped them

[*6] recover some of the costs of purchasing and restoring Wrentham House Mansion. These tax credits could be obtained only if certain conditions relating to the restoration and use of the property were satisfied. Specifically, the State of Rhode Island Historical Preservation & Heritage Commission (commission) required historically accurate restoration of the building in order for its owners to receive both credits, and for the Federal tax credit the commission also required that the property be rented to tenants for at least five years. Petitioners intended to qualify for and obtain the State and Federal tax credits. They did not intend to reside in Wrentham House Mansion.

In 2006 petitioners applied to the commission for the State tax credit, and in 2007 the commission determined that the restoration of Wrentham House Mansion up to that point met the qualifications for the credit. Petitioners did not claim or receive the Federal tax credit with respect to the Wrentham House Mansion renovation.

IV.   Wrentham House Mansion Construction

Before beginning the restoration, petitioners received cost estimates of approximately $2 million for the restoration of Wrentham House Mansion from several contractors. On the basis of an estimate submitted by M&M Marques Construction Co., Inc., petitioners hired the company as the general contractor to

[*7] restore Wrentham House Mansion.  Restoration of Wrentham House Mansion started at the end of 2002 and continued until 2008 with some unexpected delays occurring along the way.  For example, progress was delayed for several months in 2005 because of health problems of multiple subcontractors.  Work was further delayed when unforeseen structural problems with the building arose, adding time and expense to the restoration.

From the time the construction began in 2002 through 2004, Mrs. Keefe went to Wrentham House Mansion regularly to oversee the progress of the restoration.  In 2005 after the family had moved to Tampa, Florida, Mrs. Keefe flew to Newport frequently to oversee the construction.  When Mrs. Keefe was not in Newport, she closely managed the progress of the restoration via telephone calls.  On April 11, 2007, petitioners received a temporary certificate of use and occupancy for Wrentham House Mansion.  On October 31, 2007, petitioners received a second temporary certificate of use and occupancy, and on June 11, 2008, they received a final certificate of use and occupancy.  The restoration of Wrentham House Mansion was completed at the end of May 2008.

V.    Attempted Rental of Wrentham House Mansion

Many of America's wealthiest families live or vacation in Newport, Rhode Island, during the summer.  Summer rentals in Newport generally begin around

[*8] Memorial Day and end around Labor Day. Petitioners intended to offer Wrentham House Mansion for rent once the restoration of the property was complete in order to obtain the Federal income tax credits. Petitioners were informed that Wrentham House Mansion could produce rental income of $75,000 per month during the summer and $10,000 per month for the remainder of the year.[2]

In 2006 petitioners met with Laurie Hewitt Burke, a rental agent for luxury properties who was employed by Lila Delman Real Estate, to discuss renting Wrentham House Mansion. Ms. Burke inspected Wrentham House Mansion, but at that time it was not in a condition to be rented.

In 2007 Ms. Burke again visited Wrentham House Mansion and met with petitioners, but the property was still not ready to be rented. However, because petitioners hoped that the property would be ready to rent by the summer of 2007, Ms. Burke began speaking to her clients who were interested in luxury rentals in Newport about the prospect of renting Wrentham House Mansion.

---

[2]Section 6.2(2) of the declaration states that "[n]o [u]nit may be leased or rented more than one time in each calendar year" and, therefore, restricts the amount of rental income that Wrentham House Mansion could generate in a calendar year.

**[\*9]**  Ms. Burke did not post any pictures or other information about Wrentham House Mansion on any website during 2007 because she did not believe she could market it online while it was still being renovated.  Ms. Burke continued to visit Wrentham House Mansion throughout 2007 and early 2008.  Wrentham House Mansion was still being renovated in early 2008, but petitioners hoped that it would be ready to rent for the 2008 summer season.

Although Ms. Burke did not list Wrentham House Mansion for rent on her website during 2007 or 2008, she communicated its availability orally to her existing clients.  In February 2008 one of Ms. Burke's clients, who normally rented property from Memorial Day to Labor Day, expressed an interest in renting Wrentham House Mansion.  However, because the renovations were still not complete, no lessee executed a rental agreement or paid any rent to lease Wrentham House Mansion.

Petitioners did not register Wrentham House Mansion with the Newport, Rhode Island, city clerk's office as a "Short-Term Rental" or a "Guest House".[3]  Neither did they comply with the requirements of the declaration in order to rent

---

[3]According to the City of Newport, Rhode Island, city clerk, the term "Short-Term Rentals" refers to non-owner-occupied homes with rentals of nine months or less, and the term "Guest Houses" refers to bed and breakfast operations.

[*10] out Wrentham House Mansion.[4] Petitioners never secured a tenant for Wrentham House Mansion and did not rent it before its sale.

VI.     Sale Activities

Bank of America, one of petitioners' lenders, required petitioners to offer Wrentham House Mansion for sale during the construction process in order for petitioners to carry two mortgages on the property. Petitioners contracted with Lila Delman Real Estate from May 7, 2004, through August 31, 2008, and from September 8, 2008, through July 31, 2009, to list Wrentham House Mansion for sale. On or about June 22, 2005, petitioners received an appraisal report valuing Wrentham House Mansion at $12.5 million as of that date, subject to completion of the restoration work. Wrentham House Mansion was later appraised by the Assessor's Office of Newport, Rhode Island, as of August 31, 2008, at $10,667,800, and as of July 31, 2009, at $9,610,200.

In 2008 around the time the prospective tenant decided not to rent Wrentham House Mansion, Bank of America increased petitioners' required mortgage payment from $25,000 to $39,000 per month. Struggling to meet this

---

[4]The declaration requires that all leases be recorded in writing; that all leases of less than 12 months be approved by the executive board of the condominium; and that written notice of any proposed lease be sent to the owners of Carriage House at least 45 days before the proposed lease is to begin.

[*11] financial burden, petitioners pursued other avenues to sell Wrentham House Mansion. They contacted three auctioneers to arrange an auction, but for various reasons an auction never took place. On July 31, 2009, petitioners sold Wrentham House Mansion in a short sale for $6.51 million.

## VII. Basis and Expenses

The parties agree that $751,750 is the proper allocation of the purchase price of the Ocean Avenue Property to petitioners' cost basis. The parties also agree that petitioners are entitled to increase their basis by $4.5 million, which they paid for various capital expenses associated with the restoration of Wrentham House Mansion. Petitioners also paid $3.3 million of interest on loans secured by mortgages allocable to Wrentham House Mansion. Although the parties agree that the purchase price and restoration expenses are properly capitalized into the basis of Wrentham House Mansion, they disagree on whether interest paid on the loans must be capitalized.

## VIII. Tax Returns, Notices of Deficiency, and Pleading Documents

Petitioners' original Forms 1040, U.S. Individual Income Tax Return, for tax years 2004 through 2009 were prepared by Arthur Yorkes & Co. Petitioners

[*12] failed to timely file their 2006, 2007, and 2008 Federal income tax returns,[5] and they failed to pay their Federal income tax liabilities for tax years 2004, 2005, 2006, and 2007. Respondent issued petitioners notices of intent to levy to collect the unpaid tax liabilities for these years.

Petitioners prepared a list of various expenditures they made in 2009 to assist Arthur Yorkes & Co. in the preparation of their original 2009 Federal income tax return. On their original 2009 return, petitioners reported that their adjusted basis in Wrentham House Mansion was $8,560,923, and they treated the sale of the property as the sale of a capital asset. After speaking with an estate planner, petitioners decided that Wrentham House Mansion should have been treated as a business property for Federal income tax purposes and that they were entitled to an ordinary loss deduction on its sale. Petitioners subsequently hired Gabor & Associates to prepare amended tax returns for 2004 through 2009 and their original 2010 return.

In their amended 2009 income tax return, petitioners reported that Wrentham House Mansion was a business property and that their adjusted basis was $10,045,000 on the date of sale. As a result of the change in the character of

---

[5]Petitioners filed their Federal income tax returns for 2006, 2007, and 2008 on April 14, 2010.

**[*13]** and their adjusted basis in Wrentham House Mansion, petitioners reported a net operating loss (NOL), which they carried back to 2004 and then forward to 2010 using amended returns to eliminate existing tax liabilities. Petitioners' amended returns were received and processed by respondent.[6]

On May 14, 2014, respondent mailed to petitioners, by certified mail, a notice of deficiency for tax years 2008, 2009, and 2010 determining tax deficiencies, penalties, and additions to tax. On August 27, 2015, respondent mailed to petitioners, by certified mail, a notice of deficiency for tax years 2004, 2005, 2006, and 2007 determining tax deficiencies, penalties, and additions to tax. Petitioners timely filed a petition for redetermination with this Court with respect to the notices of deficiency. Respondent did not determine an addition to tax under section 6651(a)(1) in the notice of deficiency for 2008, but did assert one in an amended answer. As to all section 6662 penalties, respondent's employee secured supervisory approval as required by section 6751(b)(1).

---

[6]Petitioners did not claim depreciation expenses on Wrentham House Mansion or deduct any expenses attributable to Wrentham House Mansion for any of the taxable years at issue.

**[\*14]**                                    OPINION

I.      Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, tax deductions are a matter of legislative grace, and the taxpayer has the burden of proving entitlement to the deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). However, if a taxpayer produces credible evidence[7] with respect to any relevant factual issue and meets other requirements imposed by section 7491(a)(2),[8] the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Petitioners do not argue for a

---

[7]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[8]Sec. 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews. See Higbee v. Commissioner, 116 T.C. at 440-441.

**[*15]** shift in the burden of proof, and they have not proven that they have met the section 7491(a)(2) requirements.

II.    The Character of Wrentham House Mansion in the Hands of Petitioners

We first address whether petitioners held Wrentham House Mansion as real property used in a trade or business or as a capital asset.

A capital asset is property held by a taxpayer (whether or not connected with a trade or business), but that does not include property used in a taxpayer's trade or business for which depreciation is permitted under section 167,[9] or real property used in the taxpayer's trade or business. Sec. 1221(a)(2). Property held for the production of income, but not used in a trade or business of the taxpayer, is a capital asset subject to the limitations on losses under section 1211(b). Sec. 1.1221-1(b), Income Tax Regs.

The Court of Appeals for the Second Circuit[10] requires that taxpayers be engaged in continuous, regular, and substantial activity in relation to the

_____

[9]Sec. 167 allows a depreciation deduction for the exhaustion, wear and tear, and obsolescence of property used in a taxpayer's trade or business or property held for the production of income.

[10]This Court will "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). This case is appealable to the U.S. Court of Appeals for the Second Circuit, absent a stipulation to the contrary. See sec. 7482(b)(1)(A), (2).

[*16] management of the property to support a conclusion that the property was used in a trade or business and was not a capital asset. See, e.g., Gilford v. Commissioner, 201 F.2d 735, 736 (2d Cir. 1953) (the performance of sufficient rental-related activity, either by the taxpayer or an agent of the taxpayer, will support the conclusion that the taxpayer was engaged in a trade or business with respect to the property); Union Natl. Bank of Troy v. United States, 195 F. Supp. 382, 384 (N.D.N.Y. 1961) (stating that Grier is "settled law" in the Second Circuit); Grier v. United States, 120 F. Supp. 395 (D. Conn. 1954), aff'd per curiam, 218 F.2d 603 (2d Cir. 1955).

Petitioners contend that they held Wrentham House Mansion as an asset used in a rental real estate business. In deciding whether a rental property is used in a trade or business or is a capital asset, the Court of Appeals for the Second Circuit has examined the taxpayer's rental-related activities for continuity, regularity, and substance. Among the facts considered are the taxpayer's efforts to rent the property; the maintenance and repairs supplied by the taxpayer or an agent of the taxpayer; the taxpayer's employment of labor to manage the property or provide services to tenants; the purchase of materials; the collection of rent; and the payment of expenses. See Alvary v. United States, 302 F.2d 790, 796-797 (2d Cir. 1962); Gilford v. Commissioner, 201 F.2d at 736; Pinchot v. Commissioner,

- 17 -

**[*17]** 113 F.2d 718, 719 (2d Cir. 1940); <u>Balsamo v. Commissioner</u>, T.C. Memo.

1987-477; <u>Grier</u>, 120 F. Supp. at 398.  The totality of the facts and circumstances

surrounding the use of the property must support a conclusion that the alleged

rental activities were sufficient, continuous, and substantial enough to constitute a

trade or business with respect to the rental of the property.

While we have no doubt that petitioners devoted a great deal of time, effort,

and expense to the renovation of Wrentham House Mansion, the record

overwhelmingly confirms that Wrentham House Mansion was never held out for

rent or rented after the restoration was complete.  Quite simply, the rental activity

with respect to Wrentham House Mansion never commenced in any meaningful or

substantive way.  The cases on which petitioners rely are distinguishable because

in each case where a rental trade or business was found to exist, the taxpayer had

already started the rental activity and had provided substantial and continuous

rental-related services.  <u>See</u> <u>Alvary</u>, 302 F.2d at 796; <u>Gilford v. Commissioner</u>,

201 F.2d at 736; <u>Pinchot v. Commissioner</u>, 113 F.2d at 719.  In contrast,

petitioners never started a rental trade or business involving Wrentham House

Mansion.  <u>Richmond Television Corp. v. United States</u>, 345 F.2d 901, 907 (4th

Cir. 1965), <u>vacated and remanded on other grounds</u>, 382 U.S. 68 (1965); <u>Glotov v.

Commissioner</u>, T.C. Memo. 2007-147, slip op. at 5 (holding that a taxpayer is not

[*18] carrying on a trade or business until the business is functioning as a going concern and performing the activities for which it was organized).

Because petitioners did not commence or operate a rental activity with respect to Wrentham House Mansion during the years at issue, we hold that Wrentham House Mansion was a capital asset at the time of its sale. It follows that any gain or loss was derived from the sale of a capital asset and respondent properly disallowed the NOL carryovers.

III.  Interest Expenses

The parties agree that petitioners' basis in Wrentham House Mansion includes the portion of the original purchase price allocable to Wrentham House Mansion after the transfer of Carriage House, as well as the costs associated with the restoration work. The parties disagree as to whether petitioners are required to capitalize interest on loans taken out for the acquisition and restoration of Wrentham House Mansion.

Certain direct and indirect costs associated with producing property, including property held for investment, must be capitalized into the basis of that property. Sec. 263A(a), (b)(2)(A), (c)(1). Interest expenses are capitalized to the extent that they are paid or incurred during the period in which the property is being constructed or produced, and are allocable to real property. Id. subsec.

**[*19]** (f)(1)(A) and (B)(i). Improvements to property, including the rehabilitation or preservation of a standing building, constitute the production of property for purposes of section 263A. Sec. 1.263A-8(d)(3)(i) and (ii), Income Tax Regs. The production period begins on the date on which the physical production activity is first performed and ordinarily ends on the date that the property is ready to be placed in service or held for sale. Sec. 263A(f)(4)(B); sec. 1.263A-12(c)(2), (d)(1), Income Tax Regs. The production period, however, does not end for a unit of property before the completion of physical production activities by the taxpayer even though the property is held for sale or lease. Sec. 1.263A-12(d)(2), Income Tax Regs.

Wrentham House Mansion is a capital asset in the hands of petitioners and is subject to the uniform capitalization rules under section 263A. Their extensive restoration work is the type of improvement for which interest is appropriately capitalized under section 263A. The production period began on the date the physical restoration work began and ended on the date when it was completely finished. The date of completion of the physical construction work is the date when the renovation of Wrentham House Mansion was completed and the property was ready to be placed in service or held for sale. See sec. 1.263A-

**[\*20]** 12(d)(2), Income Tax Regs. Accordingly, we hold that interest expenses paid or incurred during the production period must be capitalized.

IV.    Additions to Tax and Penalties

The Commissioner has the initial burden of production with respect to additions to tax and penalties and must produce sufficient evidence indicating that it is appropriate to impose an addition to tax or a penalty. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Once the Commissioner satisfies his burden of production, the taxpayer may introduce evidence that the imposition of the penalty is not justified. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115; Higbee v. Commissioner, 116 T.C. at 447.

A.    Section 6651(a)(1) Additions to Tax for Failure To Timely File

In the notice of deficiency respondent determined that petitioners were liable for additions to tax for failure to timely file returns for tax years 2006 and 2007. In respondent's amended answer, respondent also asserted additions to tax for failure to timely file for tax year 2008. Section 6651(a)(1) imposes an addition to tax for failure to file a timely Federal income tax return unless the taxpayer can demonstrate that such failure was due to reasonable cause and not due to willful neglect. See United States v. Boyle, 469 U.S. 241, 245 (1985).

**[\*21]** Respondent has met his burden of production and proof supporting the imposition of these additions to tax. We find that petitioners failed to timely file their Federal income tax returns for tax years 2006 through 2008. Petitioners have made no argument and produced no evidence with respect to the additions to tax. Accordingly, we sustain respondent's determination as to the additions to tax.

B.      Section 6662(a) Accuracy-Related Penalties

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2) for tax years 2004 through 2010 for underpayments due to substantial understatements of income tax or, alternatively, to negligence or disregard of rules and regulations. A taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to a substantial understatement of income tax or to negligence or disregard of rules or regulations. Sec. 6662(a)-(d). Only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one type of conduct listed in section 6662(b). See New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 F. App'x 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs. Nevertheless, we consider both grounds for

[*22] imposition of the penalty.  The Commissioner bears the burden of production with respect to a section 6662 penalty.  Sec. 7491(c).

Section 6751(b)(1) provides that, subject to certain exceptions in section 6751(b)(2), no penalty shall be assessed unless the initial determination of such assessment is personally approved in writing by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.  Written approval of the initial penalty determination under section 6751(b)(1) must be obtained no later than the date the notice of deficiency is issued or the date the Commissioner files an answer or amended answer asserting such penalty.  Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; see also Graev v. Commissioner, 149 T.C. ___ (Dec. 20, 2017), supplementing 147 T.C. __ (Nov. 30, 2016).  Compliance with section 6751(b)(1) is part of the Commissioner's burden of production in any deficiency case in which a penalty subject to section 6751(b)(1) is asserted.  Chai v. Commissioner, 851 F.3d at 221.

The section 6662 accuracy-related penalties determined in the notices of deficiency were properly approved as required by section 6751(b) and respondent has proven sufficient facts to satisfy the burden of production and proof as to that issue.

**[*23]** 1. Substantial Understatement of Income Tax

An understatement is the excess of the tax required to be shown on the tax return over the tax actually shown on the return, reduced by any rebates. Sec. 6662(d)(2)(A). An understatement of income tax is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return in the case of an individual. Sec. 6662(d)(1)(A). Understatements are reduced by the portion attributable to (1) an item for which the taxpayer had substantial authority or (2) any item for which the taxpayer, in the return or an attached statement, adequately disclosed the relevant facts affecting the item's tax treatment and the taxpayer had a reasonable basis for the tax treatment of the item. Sec. 6662(d)(2)(B).

The substantial authority standard is an objective standard that requires an analysis of the law and relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Sec. 1.6662-4(d)(3), Income Tax Regs.

Petitioners' understatement for each tax year is greater than both $5,000 and 10% of the tax required to be shown on the return, and thus respondent has met his remaining burden of production through calculation. Neither the relevant law nor

**[*24]** the facts as found in this opinion are supportive of petitioners' position,[11] and petitioners have not introduced any evidence that they disclosed on their return the relevant facts affecting the tax treatment of items in question or that they had a reasonable basis for such treatment. See sec. 6662(d)(2)(B). So, unless petitioners had reasonable cause and acted in good faith with respect to the underpayments under section 6664(c)(1), respondent's determination regarding this penalty must be sustained.

### 2. Negligence or Disregard of Rules and Regulations

Alternatively, respondent argues that petitioners are liable for penalties under section 6662(a) for negligence or disregard of rules and regulations, and petitioners assert that they are not. For the sake of completeness, we address this ground for imposing the penalty.

"Negligence" includes any failure to make a reasonable attempt to comply with the Internal Revenue Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due

---

[11]Petitioners argue in their opening brief that "[b]ased on all the cases cited herein, it is obvious that there is substantial legal justification for the position that the loss is an ordinary loss", which we interpret as an argument that substantial authority exists for this tax treatment.

**[*25]** care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348 (9th Cir. 1991). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence in determining the correctness of a return position that is contrary to a rule or regulation. Sec. 1.6662-3(b)(2), Income Tax Regs. Disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe. Id. Disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded. Id.

Petitioners' original Federal income tax return for tax year 2009 characterized Wrentham House Mansion as a capital asset and claimed a lower adjusted basis. Petitioners subsequently hired a different return preparer, Gabor & Associates, to prepare amended returns that took a tax reporting position with respect to Wrentham House Mansion that significantly reduced petitioners' reported income tax liabilities for tax years 2004 through 2009. The amended returns treated Wrentham House Mansion as a property used in an existing trade or business, claimed a much higher adjusted basis, and claimed the NOL, which

[*26] petitioners carried to other years to eliminate their tax liabilities for all the years at issue.

Petitioners' quest for a better tax result was not supported by any meaningful analysis of the merits of their new tax reporting position. Moreover, petitioners knew that their planned rental activity had never commenced. Respondent has met his remaining burden of production with respect to his alternative penalty determination that petitioners were negligent.

### 3. Section 6664 Reasonable Cause and Good Faith Exception

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and the taxpayer acted in good faith with respect to, the underpayment. Sec. 1.6664-4(a), Income Tax Regs. The decision whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including: (1) the taxpayer's efforts to assess the proper tax liability; (2) the knowledge and experience of the taxpayer; and (3) reliance on the advice of a tax professional. Id. para. (b)(1). Generally, the most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability. Id.

[*27] Reliance on the advice of a tax professional or an honest misunderstanding of the law that is reasonable in the light of the facts and circumstances may support a conclusion that a taxpayer acted with reasonable cause and in good faith with respect to a reported position.  Id.; see Higbee v. Commissioner, 116 T.C. at 448-449.  Reliance on the advice of a professional must be reasonable under the circumstances.  Sec. 1.6664-4(b)(i), Income Tax Regs.; see also Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181; Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 97-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  The advice must be based upon an analysis of all pertinent facts and the applicable law and must not be based on unreasonable factual or legal assumptions.  Sec. 1.6664-4(c)(1)(i) and (ii), Income Tax Regs.  It cannot be based on an assumption that the taxpayer knows, or has reason to know, is unlikely to be true.  Id. subdiv. (ii).

Petitioners failed to prove that they had reasonable cause and acted in good faith within the meaning of section 6664(c)(1).  Petitioners did not make a reasonable, good-faith effort to correctly assess their tax liabilities and their claimed reliance on a tax professional was both unreasonable and not credible.  Petitioners' attempt to recharacterize the tax treatment of their investment in

[*28] Wrentham House Mansion was opportunistic and appears to have been motivated by their financial problems and unpaid income tax liabilities. This attempted recharacterization had all the markings of being "too good to be true", yet petitioners forged ahead, knowing that they had never actually commenced a rental activity involving Wrentham House Mansion and had not done all of the things the law required to be able to rent Wrentham House Mansion. Because petitioners failed to prove that they had reasonable cause for, and acted in good faith with respect to, the positions taken on their amended income tax returns and on their only return for 2010, we sustain respondent's determination that they are liable for the section 6662 accuracy-related penalties.

V.    Conclusion

We hold that:  (1) Wrentham House Mansion was a capital asset in the hands of petitioners; (2) section 263A requires that the designated interest payments made on Wrentham House Mansion be capitalized; (3) petitioners are liable for additions to tax under section 6651(a)(1) for failure to timely file Federal income tax returns for tax years 2006 through 2008; and (4) petitioners are liable for the section 6662 accuracy-related penalties as determined by respondent.

**[*29]** In reaching our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.